A94A0085. KING et al. v. BAKER et al.
(447 SE2d 129)

BIRDSONG, Presiding Judge.

Larry and Sandra Baker filed suit seeking to enjoin Sam T. King and Gloria J. King from keeping a large number of pit bulls and other dogs in dog pens and maintaining a dog breeding business at their home next to the Bakers in Coweta County.

The Kings retained a real estate agent to find a house on two acres so they could build kennels. The mortgage company's attorney and a realtor allegedly represented to the Kings that there were no restrictions concerning dogs. The Kings' deed contains no restrictive covenants concerning dogs or kennels. However, the restrictive covenants filed with deed records in the courthouse provide that no animals other than a "reasonable number of generally recognized house pets" shall be kept on the property, no animals shall be allowed to make an unreasonable noise or be a nuisance, "no structure for the . . . housing . . . of any animal shall be maintained," and that the subdivision control committee shall determine in its discretion whether a particular animal is a nuisance or whether a number of animals on a property is reasonable.

The Kings built twelve permanent pen enclosures with concrete pads and six-foot chain link fencing, visible to their next-door neighbors, the Bakers. The evidence showed unequivocally that the Kings erected two temporary pens at the back of their two-acre property when they moved in their house on September 1, 1992, and did not

make permanent pens by pouring concrete until October; until then, the dogs were kept in the garage and the Bakers did not know there were a large number of dogs on the property. Neither Mr. nor Mrs. Baker testified they noticed the kennels in late September, as the dissent says. They testified that they saw temporary kennels which Mr. King himself described both as "little bitty pens" and as "big"; the Bakers did not realize until October that the Kings were building extensive concrete dog kennels and runs for a pit bull and sharpei breeding business. Mrs. Baker testified she first complained to Mrs. King about barking dogs because she did not know they were building kennels; as soon as she saw the Kings were building kennels, she complained to them. According to Mr. King, building the kennels and dog runs consisted of pouring concrete and erecting chain link fencing. The Kings testified they poured concrete in October and Mrs. King testified the Bakers complained right before Halloween.

The Bakers are complaining more about the number of dogs being kept in the kennels than the presence of the kennels. The evidence does not establish clearly whether the concrete was poured before Mrs. Baker complained to the Kings, but it does establish unequivocally that, unbeknownst to the Bakers, the Kings kept the dogs in their garage and used two temporary pens until some time in October, and nothing unusual appeared to the Bakers; as soon as the Bakers realized the Kings were building a large number of permanent kennels and runs to keep a large number of dogs for breeding, they complained to the Kings; based on a letter of complaint written by Mrs. Baker to the architectural committee, this was about October 21, 1992. Mr. Baker testified that between the time the Kings moved in and the time the Bakers saw the pens "being constructed," they did not see all the dogs as they were evidently being kept in the garage; this indicates the pens were "being constructed" before the Bakers understood that kennels were being built for a large number of dogs. Thus, it may or may not be that the concrete was poured and permanent pens erected before the Bakers realized the Kings were building dog kennels for a large number of dogs, but the evidence establishes that the Bakers were not lax in complaining to the Kings as soon as they realized that restrictive covenants were being violated by the presence of a large number of dogs in kennels.

The Bakers unsuccessfully tried to resolve the Kings' violations of the restrictions via the subdivision control committee. The Bakers alleged that eight dogs (which later increased to fourteen) were unreasonable in number and sought to prohibit the Kings from keeping more than two dogs. The Kings counterclaimed, seeking $25,000 in damages for being discriminated against on account of their race, in violation of 42 USCA § 1982. The Kings admitted at the injunction hearing that they breed pit bulls and sharpeis. Neighbors who do not

live next door to the Kings testified they heard no noise and were not offended by the Kings' maintenance of dog kennels, but there was evidence the dogs and kennels create a substantial detriment to the Bakers next door and that the dogs barked at nearly every sound, even to Mrs. Baker's shaking out rugs on her porch; and the Bakers could not keep their door open to their screened porch.

The trial court decreed that the Kings could keep no more than two dogs and that all pens, enclosures, concrete pads, and fencing around the pens were to be removed. The court awarded the Bakers $750 attorney fees and dismissed the Kings' counterclaims. Appellants King enumerate the rulings as error, along with the enforcement of restrictive covenants as racial discrimination and the grant of equitable relief without a jury trial. They filed this appeal in the Supreme Court, which transferred the case here, per *Pittman v. Harbin Clinic Prof. Assn.*, 263 Ga. 66 (428 SE2d 328) and *Beauchamp v. Knight*, 261 Ga. 608 (409 SE2d 208). *Held*:

1. This case is in the nature of a declaratory judgment action involving legal issues and framing equitable remedies. See *Beauchamp*, supra. The trial court did not err in declaring relief to appellees without the requested jury trial. This case was properly disposed of by declaratory judgment in the form of an injunction, and by dismissal of appellants' counterclaims, for no issue of fact remained for jury resolution. See OCGA §§ 9-11-12 (c); 9-11-56; 9-4-5; 9-4-6. See also *Guhl v. Davis*, 242 Ga. 356 (249 SE2d 43). The right to a jury trial in a declaratory judgment action arises only if there is an issue of fact which requires submission to a jury and jury trial has not been waived. OCGA §§ 9-4-5; 9-4-6. Moreover, appellants did not insist on the right to a jury trial before the trial court's order was issued after a full hearing.

2. Appellants contend their counterclaims were improperly dismissed because they were not before the trial court at the injunction hearing; and that dismissal of their counterclaims was racial discrimination directed at ousting them from the neighborhood. However, evidence was offered on the Kings' counterclaims for racial discrimination, the issue was explored in detail, and no issue of fact remained for a jury. See OCGA § 9-4-5; *Guhl*, supra. The evidence showed the subdivision is populated by about 10 to 20 percent black persons. When Mrs. Baker sent a letter to the subdivision control committee prior to litigation, in addition to seeking enforcement of the restrictive covenants as to appellants' maintenance of eight dogs in pens and runs, she noted that the maintenance of an auto repair enterprise on the other side of the Kings' lot may have induced the Kings to build a fence in their front yard in violation of restrictive covenants and that "maybe [that] problem next to [the Kings] should also be corrected"; and she suggested restrictions be enforced as to other residents who

allow their pets to run loose. She complained specifically that the Kings' maintenance of dogs in pens and runs next door to her house had damaged its value and salability. The evidence established beyond any material issue of fact that the Bakers' objection is to the Kings' dogs and dog pens, not to the Kings, and the reason the Bakers sought enforcement of the covenants against the Kings and not against others is that the Kings live next door to them.

The evidence also showed the Bakers visited the Kings and tried amicably to resolve matters by having the Kings abide by the covenants. There is no evidence that the Bakers sought to oust the Kings from the neighborhood or that the Kings were targeted because of their race. The order of the trial court directing the Kings to abide by the covenants accords with the law and does not oust them from their property. The covenants themselves do not discriminate against appellants on the basis of race, color or creed. See OCGA § 44-5-60 (d) (3).

3. The trial court did not err in ordering appellants to abide by the restrictive covenants. A purchaser of land is conclusively charged with notice of restrictive covenants contained in a deed which constitutes one of the muniments of his own title (*Reeves v. Comfort,* 172 Ga. 331 (157 SE 629)); and where the covenant is recorded, as in this case, the purchaser has legal notice of it even if it is not stated in his own deed, for he takes no greater interest than his predecessor had. *O'Neill v. Myers,* 148 Ga. App. 749 (2) (252 SE2d 638).

The Kings do not have a superior equity merely because they had spent $3,000 building dog pens after or slightly before the Bakers complained and before the Bakers sought injunctive relief, or because the neighborhood subcommittee did not resolve Mrs. Baker's complaint. The principle of laches in these cases is based on a complaining party's failure to voice any objection while observing the offending party expend large sums of money building a permanent structure in violation of restrictive covenants. In *Bales v. Duncan,* 231 Ga. 813 (204 SE2d 104); *Davies v. Curry,* 230 Ga. 190 (196 SE2d 382); and *Black v. Barnes,* 215 Ga. 827 (114 SE2d 38), the complaining parties made no objection until after the offending parties had expended much money and construction building permanent large buildings of an immovable nature, and suffered actual detriment, on the failure of anybody to complain and in reliance on their right to use the buildings. The determining factor in those cases was not that the complainant did not file suit until after the other party expended large sums of money, but that the complainant made *no complaint at all* while at length observing the other party spend large sums of money building structures of a permanent nature.

The fact that the Kings erected "temporary" structures did not make it immediately apparent to the Bakers that the Kings intended

to maintain a large number of dogs on their property. The evidence shows that the Kings first kept the dogs in one building; what the Bakers saw was the puzzling sight of the Kings continuously walking the same dog in and out of the structure; finally, the Bakers realized this was not one dog being walked excessively, but that the Kings were walking several dogs which looked alike. Unlike the parties in the cases just cited, the Bakers did not then sit and do nothing while the Kings built permanent dog pens. They complained to the Kings and to the neighborhood subcommittee as soon as they realized the Kings were building or had built permanent pens to keep a large number of dogs. The evidence establishes that it was not the Bakers' fault that the Kings built the pens and that the Kings bought the property without checking the restrictive covenants, after being misinformed that they could maintain a large number of dogs on the property. Nor is it controlling that the subcommittee failed to act, for the restrictive covenants expressly give the right to enforcement at law. The statement in *Bacon v. Edwards*, 234 Ga. 100, 103 (214 SE2d 539), that "[a] mere objection or protest, or a mere threat to take legal proceedings is not sufficient to exclude consequences of laches or acquiescence," does not mean laches will attach even when a complaint is made.

What *Bacon* said altogether was, "[i]n determining whether there has been laches, there are many factors to be considered, including the sufficiency of the excuse offered in extenuation of the delay in bringing suit. [Cits.]" Id. *Bacon* affirmed a jury verdict enforcing restrictive covenants even though the complaining parties did not "voice an objection" (see *Bacon* at 101) until months after they noticed the other parties digging for construction within five feet of their property, after excavation and after footings and brick foundation and a concrete slab were laid and studs were erected; they did not file suit until nearly ninety percent of the building had been completed, seven or eight months after they first noticed the construction. In *Bacon*, the Supreme Court found *Bales*, supra, *Davies*, supra, and *Black*, supra, insufficient to require reversal of a jury verdict upholding the restrictive covenants; according to *Bacon*, those earlier cases do not stand for the idea that the mere delay of the complaining party of one month or eight months in filing suit for injunction will invoke the doctrine of laches.

As *Bacon* says, laches is normally a question for a jury and, as we have noted in Division 1, supra, the court may decide that question like any other where no genuine issue of fact remains for a jury. Unlike the complaining parties in *Bacon, Bales, Davies*, and *Black*, supra, the Bakers complained to the Kings and to the neighborhood subcommittee as soon as they realized the Kings intended to keep a large number of dogs on their property. The Bakers did not file suit

immediately because they wanted to resolve the issue by subcommittee, as the covenants provide. To suggest that the Kings acquired equitable rights in their violations merely because they managed to build the dog pens before the Bakers realized that they intended to keep many dogs in kennels and runs in a breeding business, or because the Bakers tried to avoid litigation by settling the dispute within the neighborhood, is to say that any restrictive covenant can be successfully violated, even in the face of complaints, merely by expending a large sum of money to erect a structure before the complaining party can figure out what is happening or can get to the courthouse to file a lawsuit. This would stand the law of restrictive covenants on its head.

As for the fact that the Kings say they spent in excess of $3,000 building the permanent pens and runs, Mr. Baker testified that the 12 dog kennels and breeding business "most definitely" affected the value of his property, because "I don't think anybody in their right mind would buy a house in a housing development with dog pens that look like a dog pound." He also testified that he would suffer irreparable damage if his neighbor is allowed to maintain the dog kennels.

The trial court did not err in the facts of this case by issuing an injunction against the Kings to enforce the restrictive covenants.

4. The evidence supports the award of attorney fees to appellees. The restrictive covenants allow enforcement by proceedings in law and equity or to recover damages. Nothing in OCGA § 13-6-11 limits attorney fee awards to actions at law or excludes equity actions from its application. There is no logical reason that such actual damages should be unavailable to equity actions as a remedy, and there is no reason the plaintiffs should be forced to choose between enforcing the covenants at equity or recovering their actual damages including attorney fees in an action at law which will not afford them complete relief. Generally, equity follows the law (OCGA § 23-1-6), and equity seeks to do complete justice and may give full relief to all parties in relation to the subject matter. This would include attorney fees authorized by OCGA § 13-6-11.

Although the Supreme Court held in *Glynn County Fed. Employees Credit Union v. Peagler*, 256 Ga. 342 (3) (348 SE2d 628) that attorney fees were not authorized under OCGA § 13-6-11 because plaintiff sought only equitable relief, that holding was not supported by citation or reasoning, and in the more recent case of *Clayton v. Deverell*, 257 Ga. 653 (4), (5) (a) (362 SE2d 364), the court holds that attorney fees may be awarded under OCGA § 13-6-11 in an equitable action. In numerous other cases the Supreme Court "has specifically held that attorney fees are allowable under this section in equity actions. *Jones v. Spindel*, 239 Ga. 68 (235 SE2d 486) (1977); *Grant v. Hart*, 197 Ga. 662 (30 SE2d 271) (1944)." *C & S Nat. Bank v. Has-*

*kins,* 254 Ga. 131, 137 (4) (327 SE2d 192). When the Supreme Court decided *Clayton v. Deverell,* supra, it chose not to follow its prior decision in *Glynn County Fed. Employees Credit Union v. Peagler,* and we are bound to follow the same course. Moreover, *Glynn County Fed. Employees Credit Union* does say that attorney fees are recoverable where authorized by statute or by conduct, as in the case here.

5. The trial court erred in ruling that appellants could not keep more than two dogs on their property. The restrictive covenant provides that the subdivision control committee "shall determine in its discretion" whether a number of animals on a particular property is reasonable. Although the restrictive covenants authorize their enforcement at law and equity, the restrictive covenants may not be enlarged upon by judicial construction and the ground for any interference by the courts must be clear and indubitable. *England v. Atkinson,* 196 Ga. 181, 184 (26 SE2d 431). Although the Bakers suggested that the control committee had decreed that two dogs are the maximum allowed, no competent evidence is cited that the committee made such a decree. A covenant plainly expressed cannot be broadened by parol proof of a covenantor. *Miller v. Desverges,* 75 Ga. 407. The covenant plainly vests the decision as to what is a reasonable number of dogs in the discretion of a neighborhood committee and in no one else; the court could not enlarge upon this right in favor of appellees (*England,* supra), and the mere fact that the committee had not acted does not give the trial court authority to act for the committee. The part of the judgment prescribing the number of dogs appellants may keep is vacated, and the case is remanded for appropriate order stating that appellants are directed to comply with the restrictive covenants which vest discretion in the neighborhood committee to determine what is a reasonable number of dogs on the particular property.

6. The trial court's order directing appellants to remove all pens is affirmed, as this restriction is expressed in the covenants and is not enlarged upon by the trial court.

*Judgment affirmed in part and reversed in part. Pope, C. J., McMurray, P. J., Beasley, P. J., and Johnson, J., concur. Andrews, Blackburn, Smith, JJ., and Senior Appellate Judge Harold R. Banke concur in part and dissent in part.*

BLACKBURN, Judge, concurring in part and dissenting in part.

I concur with Divisions 1 through 3 and Divisions 5 and 6 of the majority opinion. I agree that the trial court's findings on the issue of laches should be affirmed and the trial court's determination of the number of dogs the Kings can reasonably maintain must be reversed. However, I must respectfully dissent from Division 4 of the majority opinion.

The trial court erred in awarding attorney fees in this action for equitable relief. Attorney fees are recoverable only where authorized by statute or contract. Where, as in this case, the complaint set out only an action in equity, a party is not entitled to attorney fees under OCGA § 13-6-11. *Glynn County Fed. Employees Credit Union v. Peagler*, 256 Ga. 342 (3) (348 SE2d 628) (1986). Moreover, the covenant at issue does not provide for the recovery of attorney fees in enforcing its provisions. While the majority asserts that the Supreme Court's decisions in *Clayton v. Deverell*, 257 Ga. 653 (362 SE2d 364) (1987); *C & S Nat. Bank v. Haskins*, 254 Ga. 131 (327 SE2d 192) (1985); *Jones v. Spindel*, 239 Ga. 68 (235 SE2d 486) (1977); and *Grant v. Hart*, 197 Ga. 662 (30 SE2d 271) (1944), authorize a recovery of attorney fees in the present action for equitable relief only, in each of those cases, the plaintiffs/petitioners *sought monetary damages in addition to equitable relief* and therefore, attorney fees were appropriate in those cases. The award of attorney fees against the Bakers should be reversed however, as only equitable relief was sought in this case.

I am authorized to state that Judge Andrews, Judge Smith and Senior Appellate Judge Harold R. Banke join in this dissent.

DECIDED JULY 13, 1994 —
RECONSIDERATION DENIED JULY 29, 1994 — 

*Millard C. Farmer, Jr.*, for appellants.

*Harwell, Brown & Harwell, Ronald H. Harwell, Levine & Block, Stephen H. Block, Webb, Carlock, Copeland, Semler & Stair, Johannes S. Kingma, Drew, Eckl & Farnham, Richard T. Gieryn, Jr.*, for appellees.